STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARTIN CARBONE AND PASQUALE BORRELLI, DEFENDANTS-APPELLANTS, AND JOHN POLO, DEFENDANT.

Argued May 8, 1962—Decided June 29, 1962.

Mr. *Thomas E. Durkin, Jr.,* argued the cause for defendants-appellants (*Mr. Gregory J. Castano,* on the brief; *Mr. George S. Grabow,* attorney for defendant-appellant Borrelli).

Mr. *Brendan T. Byrne,* Essex County Prosecutor, argued the cause for plaintiff-respondent (*Mr. C. William Caruso,* Legal Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendants appeal from convictions for bookmaking and conspiracy to make book. We certified the matter before the Appellate Division considered it.

During a raid conducted under a search warrant, a police officer answered the telephone. The sole claim before us is that it was error to permit him to testify:

"I picked up the phone and said, 'Hello,' and the caller said, 'Pat' and I said, 'Yes.' He said, 'Give me Silky Jet at Laurel, five across.'"

The questions are whether (1) there was a violation of section 605 of the Federal Communications Act (47 *U. S. C.*); (2) if there was, the statute itself or sound judicial administration bars receipt of the evidence; and (3) the search-and-seizure provision of the Fourth Amendment was infringed.

## I.

We will start with the second and third of these questions. In *State v. Giardina,* 27 *N. J.* 313, 315 (1958), we pointed out that the federal rule excluding evidence obtained in violation of the federal statute does not apply to the states. It had been so held in *Schwartz v. Texas,* 344 *U. S.* 199, 73 *S. Ct.* 232, 97 *L. Ed.* 231 (1952), and *Benanti v. United States,* 355 *U. S.* 96, 78 *S. Ct.* 155, 2 *L. Ed. 2d* 126 (1957). After *Giardina* the doctrine was

reiterated in *Pugach v. Dollinger,* 365 *U. S.* 458, 81 *S. Ct.* 650, 5 *L. Ed. 2d* 678 (1961).

Defendants urge we should find those cases were silently overruled a few months after *Pugach* by *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961). In *Mapp* the Court, overturning its prior rulings, held the state courts must exclude evidence obtained by an unreasonable search and seizure in violation of the Fourth Amendment. *Mapp,* however, dealt solely with that constitutional provision. The federal rule excluding proof of messages intercepted in violation of section 605 rests upon the supervisory power of the judiciary rather than upon the command of either the statute or of a constitutional provision. We cannot assume that *Mapp* was intended to deny that thesis. Others have held that *Mapp* did not. *Williams v. Ball,* 294 *F. 2d* 94 (2 *Cir.* 1961), *cert.* denied 368 *U. S.* 990, 82 *S. Ct.* 598, 7 *L. Ed. 2d* 526 (1962); *People v. Dinan,* 11 *N. Y. 2d* 350, 229 *N. Y. S. 2d* 406, 183 *N. E. 2d* 689 (*Ct. App.* 1962).

 Nor does wire-tapping as such involve a search or seizure within the Fourth Amendment. That was the holding of *Olmstead v. United States,* 277 *U. S.* 438, 48 *S. Ct.* 564, 72 *L. Ed.* 944 (1928), and although the dissents in that case continue to claim strong support, *Olmstead* remains the controlling view of the *Constitution.* *Goldstein v. United States,* 316 *U. S.* 114, 120, 62 *S. Ct.* 1000, 86 *L. Ed.* 1312, 1318 (1942); *Goldman v. United States,* 316 *U. S.* 129, 135, 62 *S. Ct.* 993, 86 *L. Ed.* 1322, 1328 (1942); *Silverman v. United States,* 365 *U. S.* 505, 81 *S. Ct.* 679, 5 *L. Ed. 2d* 734 (1961). We find nothing to the contrary in *Mapp.* Accordingly we need not consider whether, if the Fourth Amendment did apply to the interception of a telephonic message, the search and seizure in the present case could be said to be "unreasonable" in view of the fact that they occurred as an incident to a lawful arrest and as well a lawful search of the premises under the authority of a search warrant.

The remaining question with respect to exclusion of the evidence is the one we expressly left open in *Giardina* (27 *N. J.*, at *p.* 315):

"Hence the issue is not one of constitutional law or evidence. Rather, since an unauthorized disclosure of an illegally intercepted message itself constitutes a violation of a criminal statute, the question sought to be presented to us is whether as a matter of judicial administration we should countenance the commission of crime in our courtrooms. *Commonwealth v. Chaitt*, 380 *Pa.* 532, 112 *A.* 2d 379 (*Sup. Ct.* 1955), *certiorari* denied 350 *U. S.* 829, 76 *S. Ct.* 59, 100 *L. Ed.* 740 (1955). Our statute \* \* \* expressly denounces the act of testifying, and the federal statute has been so construed. *Nardone v. United States*, 302 *U. S.* 379, 382, 58 *S. Ct.* 275, 82 *L. Ed.* 314 (1937); *Schwartz v. State of Texas, supra* (344 *U. S.*, at *page* 201, 73 *S. Ct.*, at *page* 234); *Benanti v. United States, supra* (355 *U. S.* 96, 78 *S. Ct.* 155, 2 *L. Ed.* 2d 126). The suggested issue is far-reaching, and we should not resolve it unless the case necessarily requires a decision. We are satisfied that it does not, for the reason that Mrs. Kolano's testimony does not fall within either the state or federal acts."

We note that after *Giardina* the United States Supreme Court refused to restrain the use of wire-tap evidence in a State court. *Pugach, supra,* 365 *U. S.* 458, 81 *S. Ct.* 650, 5 *L. Ed.* 2d 678. And in *People v. Dinan, supra,* 11 *N. Y.* 2d 350, 229 *N. Y. S.* 2d 406, 183 *N. E.* 2d 689, the New York Court of Appeals, by a vote of 4 to 3, held that wire-tap evidence will be accepted, the dissenters expressing the view that such evidence should be barred as a matter of state law.

In *Giardina* we found it unnecessary to decide the question. Here, too, the question need not be decided since we are satisfied that section 605 was not violated.

## II.

In deciding whether the federal statute embraces the case before us, "we must bear in mind that we are construing criminal statutes and that the ultimate question is whether the witness is guilty of crime." *Giardina, supra*

(27 *N. J.,* at *p.* 316). This of course "does not mean that a ridiculous result shall be reached because some ingenious path may be found to that end. Rather it means that a statute shall not be extended by tenuous interpretation beyond the fair meaning of its terms lest it be applied to persons or conduct beyond the contemplation of the Legislature." *State v. Provenzano,* 34 *N. J.* 318, 322 (1961).

Section 605 reads as follows (we have interpolated numbers for ease in referring to the several clauses):

(1) "No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; (2) and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; (3) and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign 'communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; (4) and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress."

Defendants say the officer here "intercepted" and divulged a communication without the authority of the "sender" within the meaning of the second clause.

The facts are clear enough. The bettor thought he was speaking to "Pat" and meant his message for him, but in fact the bettor gave his message directly to the officer. They were the only parties to the conversation. The officer did not "intercept" a communication in the sense of intruding upon a conversation between two others. The question is whether this factual pattern comes within the denunciation of section 605.

The statute was not designed to create a new category of confidential communications. Indeed, the first clause expressly provides that the messages shall be produced by the carrier itself "in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority." See *Newfield v. Ryan,* 91 *F.* 2d 700 (5 *Cir.*), *cert.* denied 302 *U. S.* 729, 58 *S. Ct.* 54, 82 *L. Ed.* 563 (1937). "The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation." *Goldman v. United States, supra* (316 *U. S.,* at *p.* 133, 62 *S. Ct.* 993, 86 *L. Ed.,* at *p.* 1327). "The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone." *Rathbun v. United States,* 355 *U. S.* 107, 110, 78 *S. Ct.* 161, 2 *L. Ed.* 2d 134, 137 (1957).

The second clause of the statute protects the established line of transmission; the prohibition is against intervention into that channel. This is the view of it we find in *Goldman, supra,* 316 *U. S.* 129, 62 *S. Ct.* 993, 86 *L. Ed.* 1322, and *Rathbun v. United States, supra,* 355 *U. S.* 107, 78 *S. Ct.* 161, 2 *L. Ed.* 2d 134. The facts of our case do not match those of either *Goldman* or *Rathbun,* but they do fall within their composite thesis. In *Goldman* a detectaphone was attached to a partition wall and thereby officers heard a man in the next room participate in a telephone conversation. The court found no violation of section 605, saying (316 *U. S.,* at *p.* 134, 62 *S. Ct.* 993, 86 *L. Ed.,* at *p.* 1327):

"\* \* \* As has rightly been held, this word [intercept] indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver."

Thus "intercept" was construed to signify an intervention into the line. See *Silverman v. United States, supra,* 365 *U. S.* 505, 81 *S. Ct.* 679, 5 *L. Ed. 2d* 734. And in *Rathbun* the court held that the statute was not violated when a party to the call arranged for a third person to listen in on a regular extension line and did so without the consent of the other party to the conversation. Thus one who uses the telephone is not assured that his messages will reach only the ears for which he meant them. So long as the physical integrity of the established line is not violated, there is no interception within the meaning of section 605.

In the case before us, there was no tampering with the established means of communication. Indeed the officer was the immediate party to the call. The bettor intended his words to reach the officer, albeit the bettor thought he was someone else. Thus the officer did not "intercept" a message while it was *en route* to another; there was no other on the line.

Testimony by officers as to telephone calls received by them at the time of a raid is quite commonplace. Surprisingly there are few cases considering the applicability of section 605. They do, however, unanimously hold there is no interception within section 605 or comparable state statutes. *Billeci v. United States,* 87 *U. S. App. D. C.* 274, 184 *F. 2d* 394, 24 *A. L. R. 2d* 881 (1950); *People v. Kelley,* 22 *Cal. 2d* 169, 137 *P. 2d* 1 (*Sup. Ct.*), appeal dismissed 320 *U. S.* 715, 64 *S. Ct.* 264, 88 *L. Ed.* 420 (1943); *People v. Vertlieb,* 22 *Cal. 2d* 193, 137 *P. 2d* 437 (*Sup. Ct.* 1943); *People v. Onofrio,* 65 *Cal. App. 2d* 584, 151 *P. 2d* 158 (*D. Ct. App.* 1944); *People v. Barnhart,*

66 *Cal. App. 2d* 714, 153 *P. 2d* 214 (*D. Ct. App.* 1944); *People v. Miller,* 146 *Cal. App. 2d* 444, 304 *P. 2d* 208 (*D. Ct. App.* 1956); *People v. Carella,* 191 *Cal. App. 2d* 115, 12 *Cal. Rptr.* 446, 460 (*D. Ct. App.* 1961); *Commonwealth v. Smith,* 186 *Pa. Super.* 89, 140 *A. 2d* 347 (*Super. Ct.* 1958).[1]

Defendants point out that while *Billeci, supra,* said "We think that interception of a phone call necessarily involves the idea that a speaker thinks he is talking to one person whereas in fact a third person is listening," it added that "Perhaps, if the marshals had impersonated the wanted recipients, a different question might be presented" (184 *F. 2d,* at *p.* 397). Defendants before us press the question there reserved, since the officer said "Yes" when asked "Pat?"

In the other cases we have cited, no point was made with respect to this question although the facts in some of them reveal the same situation we have before us. We doubt there is a difference between answering "Yes" to "Pat?" and taking a message one knows is being given under the misapprehension that the listener is Pat. In both cases, Pat is impersonated in any realistic view.

At any rate section 605 does not deal with all the evils which may attend the use of a telephone. A wrong number may bring to the phone an individual unworthy enough to listen to a message he knows was meant for another. Worse yet, a person may obtain information by making a call

---

[1] We think it unnecessary to consider the further thought that since neither defendant was in fact a party to the call, he is not a "sender" and hence may not object. In *Goldstein v. United States,* 316 *U. S.* 114, 121, 62 *S. Ct.* 1000, 86 *L. Ed.* 1312, 1318 (1942), the Court said:

"* * * The court below was of the view that a divulgence of the intercepted messages might lawfully be made with the consent of the sender, and we agree. The court further thought that, as the sender might make such divulgence lawful by his consent, none but he was intended to be protected against divulgence by the statute. Again we agree."

under false colors. One may have strong views upon the subject but the question is whether the statute deals with it. We think it does not. The statute speaks of the interception of a communication, and despite any misrepresentation, the fact remains that when *A* is talking with *B,* he does not intercept a message which is then *en route* to *C.*

The use of a telephone to accomplish an improper aim is a topic unto itself. Involved are policy questions which the legislative body must resolve. Impersonation can be an odious thing, but it need not always be. It is wrong to impersonate an officer of the law. But is it wrong for an officer of the law to impersonate a criminal? Officers commonly do, and many applaud them for their skill and courage. They pretend to be drug addicts. They become privy to conspiracies by misrepresentation. Should it be a crime for an officer to call a suspected bookmaker and ask for racing information? And should it matter that the officer claimed as well the identity of some specific person known to the bookmaker? We ask these questions simply to emphasize that the subject of impersonation and the like is distinct from the subject of intercepting a communication between others. Keeping in mind, as we said at the outset, that we are construing a criminal statute in its application to the witness, we cannot fairly find that the situation before us falls within the denunciation of section 605.

Finally, defendants rely upon the third clause of section 605, which we repeat for convenience:

"\* \* \* and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto."

The argument is that the police officer was not "entitled" to the message, and the use of it at the trial was "for the benefit of another not entitled thereto," *i. e.,* the State.

It will be noted that similar language appears in the fourth clause with respect to messages which were intercepted in violation of the second clause. In *Goldstein, supra,* 316 *U. S.,* at *p.* 122, 62 *S. Ct.* 1000, 86 *L. Ed.,* at *pp.* 1318–1319, the court left open the question whether the use of *intercepted* messages by federal agents for the benefit of the government constituted use "for the benefit of another" within the meaning of the fourth clause. In *Pugach v. Klein,* 193 *F. Supp.* 630, 639–641 (*S. D. N. Y.* 1961), the court held the fourth clause did not bar use of such messages for the benefit of the State of New York, *i. e.,* that a State is not "another" within the intent of the statute.

We are not concerned with the fourth clause since there was no interception of a message. Rather defendants rely upon the third clause which does not in its terms depend upon a prior interception. Of course, if the State is not "another" within the concluding phrase of the third clause, the inquiry would be at an end. But it seems to us that the third clause is inapplicable for the more basic reason that it relates only to the use of messages obtained by personnel of the communication agency itself. The first clause plainly applies to the employees of the system, and it deals with the initial acquisition of the message. The second clause deals with the initial acquisition of a message by others through interception. The third and fourth clauses then deal with the subsequent use of the message, the third clause dealing with such use by personnel of the carriers while the fourth clause deals with subsequent use of messages intercepted in violation of the second clause.

The suggestion that the third clause would apply to a non-intercepted message in the hands of a stranger to the communication system is supported, so far as we have found, only by the dissenting opinion in *State v. Kelley, supra* (137 *P. 2d,* at *pp.* 6–7). In reaching that result the dissenting opinion had to reject the view in *Sablowsky v. United States,* 101 *F. 2d* 183, 186 (3 *Cir.* 1938), that

the third clause relates only to the personnel of the carrier. We think that *Sablowsky* was correct and that its thesis was embraced implicitly in *Weiss v. United States*, 308 U. S. 321, 327–328, 60 *S. Ct.* 269, 84 *L. Ed.* 298, 302 (1939). The question in *Sablowsky* and in *Weiss* was whether the second clause forbade interception of an *intrastate* message. The first and third clauses expressly refer to "interstate or foreign" communications whereas the second and fourth clauses refer to "communications" without any limitation. It was held that Congress was concerned with protecting interstate and foreign communications and was able to do so in such terms in the first and third clauses because the personnel of the communication carrier could differentiate such messages from intrastate ones, whereas, since messages of both sorts pass indiscriminately over the same wires and an interceptor could not distinguish between them, the interstate and foreign messages could be protected only by a blanket prohibition against the interception of any message. The third clause applies to the use of messages initially acquired by personnel of the agency, and hence does not embrace the present case.

The judgments are affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.